UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                                         Criminal No. 21-596 WJ

ALEXIS RIEGO,

    Defendant.

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO SUPPRESS STATEMENTS AND EVIDENCE

**THIS MATTER** comes before the Court upon Defendant's First Motion to Suppress Statements and Evidence (Doc. 35), filed January 31, 2022. Having reviewed the parties' pleadings and the applicable law, and after considering the evidence, testimony and oral arguments of counsel at the May 23, 2022 hearing, this Court **GRANTS IN PART** and **DENIES IN PART** the motion.

## BACKGROUND

Defendant is charged with involuntary manslaughter and assault. He was working as a truck driver while driving on Interstate 40 through the Laguna Pueblo reservation on September 7, 2019. He allegedly crashed into several vehicles while driving at a high rate of speed, which resulted in the death of four people and two others receiving serious injuries. Parties dispute the cause of the crash. There is no evidence that Defendant was under the influence of drugs or

alcohol,[1] but the Government seeks to prove that Defendant was Facetiming his wife while driving.

      Defendant brought the instant Motion to Suppress, requesting the Court suppress certain statements that were allegedly obtained in violation of his *Miranda* rights. He alternatively argues that the statements were made involuntarily. Specifically, immediately after the crash, Defendant spoke with various law enforcement officers on the side of the road and in law enforcement vehicles. He was never given *Miranda* warnings and all conversations were had in English. Defendant's native language is Spanish as he is originally from Cuba. Defendant has lived in the United States for 26 years and while he may not speak or understand English perfectly, he speaks and understands English at a level where overall he functions very well as a commercial truck driver and a citizen of the United States. *See Pretrial Services Report,* Doc. 7, p.2.

      The Court will address the suppression arguments as they pertain to four pieces of Evidence. The first Government Exhibit, "Bates 1661," is a 25-minute long video and audio account generally displaying the scene immediately after the car crash and containing a brief conversation with Defendant. The next two Exhibits, "Bates 1659" and "Bates 1520" show a conversation between Defendant and Laguna Police Department Special Agent Kevin Perno. Bates 1659 is a video and audio exhibit showing the lead up to the interrogation in a law enforcement vehicle. Bates 1520 provides only audio of the actual interrogation inside the vehicle. Lastly, "Bates 4a" is the audio of an interview that Defendant had at the scene of the incident later that day with FBI Special Agent Ryan Kacher. The Court will address each of

---

[1] The Court understands that Defendant's Expert, Dr. Alan Zelicoff, intends to testify that Defendant was taking the prescribed medications of paroxetine/Paxil, cyclobenzaprine/Flexeril, acyclovir, and diclofenac.

these pieces of evidence in turn as they relate to Defendant's *Miranda* and involuntariness arguments.

**DISCUSSION**

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In order to protect against compelled self-incrimination, law enforcement officers are required to provide *Miranda* warnings to individuals in certain circumstances—namely before a "custodial interrogation" occurs. *Miranda v. Arizona*, 383 U.S. 436, 444 (1966). In the case at bar, Defendant was indisputably interrogated by various officers at the scene of the incident when they asked him a series of questions involving the crash. The threshold question, therefore, is whether Defendant was "in custody" during these interrogations. "In custody" is defined as whether the detainee would reasonably believe his freedom of action had been curtailed to a degree associated with formal arrest. *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993). The Tenth Circuit has articulated two relevant inquiries: 1) What were the circumstances surrounding the interrogation? 2) Would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave? *U.S. v. Alfaro*, 2008 WL 5992268, at *22-23 (D.N.M. Dec. 17, 2008) (citing *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000)).

**I.     Bates 1661: Laguna Police Department Video Exhibit of Scene of Incident**

The Government's first exhibit entitled Bates 1661 displays the scene immediately after the crash. It is a 25-minute long video, most of which was not relevant to the hearing. The relevant portion begins around the 15-minute mark. Defendant is seen standing on the side of the road alone when two officers approach him. Defendant asks the officer, "Habla Espanol?" which means "Do you speak Spanish?" The officer did not speak Spanish and asked, "What happened?" Among

3

other statements, Defendant responds that he was driving 68 or 70 miles per hour on his way to Albuquerque. Though slightly inaudible, he says something to the effect of "The traffic stopped so suddenly that I didn't have a chance to stop." He says it happened too fast to remember which car was two cars in front of him. The officers then take his driver's license and ask him to retrieve his truck information/registration. Around the 19-minute mark, Defendant returns with his truck information. The officers return his license to him and then take pictures of his information.

The relevant question is whether Defendant was "in custody" during this conversation. Nothing about this questioning is improper or suggests that Defendant would not have felt free to end the encounter. Defendant was outside when he encountered the officers, the officers did not obstruct his movement in any way, they did not seize his license before questioning him, and they told him to go over to his truck by himself to obtain his registration. A reasonable person would have felt free to end this encounter. *See also Berkemer v. McCarty*, 468 U.S. 420 (1984) (roadside questioning of motorists does not constitute custodial interrogation). As such, the statements were not given in violation of *Miranda*.

Defendant also argues that these statements should be suppressed because they were involuntary statements. The Government must prove by a preponderance of the evidence that the confession was voluntary. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). A confession is voluntary if it is "the product of an essentially free and unconstrained choice by its maker." *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973). The due process voluntariness test examines "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (2000). The test takes into consideration "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Id*.

Other factors courts consider in determining voluntariness include (1) age, intelligence, and education of the defendant; (2) length of detention; (3) length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment. *United States v. Toles*, 297 F.3d 959, 965-66 (10th Cir. 2002). Defendant was 37 years old at the time of the incident and interrogation. He graduated from high school. Though he was born in Cuba and had no experience in the criminal justice system, he spoke English to a reasonable degree of fluency. As the Pretrial Services Report states, Defendant reports that he is a naturalized U.S. Citizen (Doc. 7) and he was able to obtain a Commercial Driver's License ("CDL").  Defendant initially asked the officer if he spoke Spanish, but then proceeded to have a coherent conversation in English. The conversation lasted a few minutes and occurred outside on the side of the road. Officers stood a reasonable distance from Defendant during their questioning. The officers were armed and wearing their field or duty uniforms, but did not use any overly aggressive or accusatory tones and did not touch or use force against Defendant. Defendant independently walked to his truck without the presence of any officer. Defendant was not advised of any rights, however he was not in custody.

Defendant argues that the officers took advantage of his limited knowledge of English and his fragile mental state. Though Defendant's English is not perfect, and though he first asked if they spoke Spanish, he appears conversant and answers questions accurately. As the Government correctly points out, Defendant's command of the English language was sufficient enough for him to obtain a CDL that allowed him to operate a tractor/trailer rig. Federal law requires that he "read and speak the English language sufficiently to converse with the general public, to understand highway traffic signs and signals in the English language, to respond to official inquiries, and to make entries on reports and records." 49 C.F.R. § 391.11(b)(2). Additionally, Defendant is a

naturalized U.S. Citizen. Moreover, Defendant does not appear overly distressed or manic during the interview—he appears appropriately emotional given the situation (i.e. distraught, shocked, disappointed, and sad). He is not unreasonably expressive such that an officer would be taking advantage of him by trying to have a conversation. Overall, Defendant was not unusually susceptible to pressure, the agents did not engage in any misconduct, and the statements were freely given. Therefore, these statements were not involuntary, and will not be suppressed.

## II.     Bates 1659 and 1520: Agent Perno's Interrogation of Defendant Inside Vehicle

At the scene of the accident, Laguna Police Department Special Agent Kevin Perno interrogated Defendant inside a parked police vehicle. Defendant was not under arrest and parties dispute whether he was "in custody" during this questioning. Defendant argues that Agent Perno questioned him while another armed agent physically blocked him into the vehicle, preventing his ability to exit, and then closed the door with Defendant inside. Defendant asserts that he was not informed that he was free to leave and that the conversation was confusing due to the language barrier. Following the interrogation, he signed a written statement, again without being advised of his rights.

The Government argues that Defendant actually initiated this conversation by telling a patrolman that he wanted to speak with someone. According to the Government, the patrolman told Defendant that an LPD officer could take his statement. The patrolman allegedly gave Defendant a bottle of water and let him sit in a police vehicle because it was hot outside. Agent Perno then approached Defendant, escorted him to a different vehicle, and began the interrogation in the vehicle. The Government argues that it was actually Defendant who requested the door to that vehicle be closed to reduce noise from the nearby freeway. It also points out that Defendant signed a statement acknowledging that he was not under arrest.

Indeed, New Mexico State Police Officer Justin Davis testified that when he spoke with Defendant, he told him that he would need to give a statement to someone. He then escorted him to a police vehicle and allowed him to sit in the back with the door open because it was hot outside. Defendant remained there until Agent Perno arrived, who told Defendant he needed to get his response of what occurred. Agent Perno and another officer escorted Defendant to another police vehicle. The video exhibit shows Defendant sitting in the passenger seat of a vehicle while drinking a water bottle. *Bates 1659*. The exhibit portrays a very sunny day and Defendant appears to be hot. *Id*. Notably, Defendant's access to exit the vehicle was blocked by another officer who was recording the interaction between Agent Perno and Defendant. That officer was standing right by the open car door, preventing Defendant's exit. *Id*. More importantly, however, is the fact that Agent Perno, who was in the driver's seat, took Defendant's driver's license, and then asked him to describe what happened from start to finish. *Id*. Defendant told the officers, "That's fine if you want it closed," and gestured to the door and his ear, implying that he cannot hear very well due to the noise. *Id*. The officer blocking him into the car then closed the door and walked away. The interrogation ensued. *Bates 1520*. Defendant was not informed that he was not under arrest or that he was free to leave.

The presence of the officer blocking Defendant into the vehicle, the fact that Defendant was not informed that he was free to leave, and that Agent Perno told Defendant he *needed* to get his statement weigh in favor of suppression. However, the most important portion of this interaction is that Agent Perno took and held onto Defendant's license for the duration of the interrogation. An individual "would not reasonably have felt free to leave or otherwise terminate the encounter with the agents because his driver's license had not been returned to him." *United States v.*

*Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995)[2]. In *United States v. Lambert*, the Tenth Circuit stated,

> Though not directly on point in the context of this case, the Tenth Circuit has consistently held that the undue retention of an individual's driver's license during a traffic stop renders the encounter nonconsensual. *Compare United States v. Gonzalez-Lerma*, 14 F.3d 1479, 1483 (10th Cir. 1994) ("This Circuit follows the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him."), cert. denied, 114 S. Ct. 1862 (1994) and *United States v. Walker*, 933 F.2d 812, 817 (10th Cir. 1991) ("[T]he encounter in this case was clearly not consensual. Officer Graham retained the defendant's driver's license and registration during the entire time he questioned the defendant."), *with United States v. Werking*, 915 F.2d 1404, 1408 (10th Cir. 1990) ("The initial investigative detention was concluded when [the officer] returned Werking's license and registration papers. At this point, the encounter . . . became an ordinary consensual encounter."). As in the above cited cases, Mr. Lambert would not reasonably have felt free to leave or otherwise terminate the encounter with the agents because his driver's license had not been returned to him. While we agree with the government that Mr. Lambert could have left the airport by plane, taxi, or simply walking down the street, as a practical matter he was not free to go.

*Id*. The Court clarified,

> The question of whether an individual has been detained turns on whether a person under the circumstances would reasonably feel at liberty to refuse the agents' questions or otherwise terminate the encounter. The question is not, as the government seems to suggest, whether it is conceivable that a person could leave the location of that encounter. Precedent clearly establishes that when law enforcement officials retain an individual's driver's license in the course of questioning him, that individual, as a general rule, will not reasonably feel free to terminate the encounter.

*Id*.

Therefore, because Agent Perno failed to provide Defendant with *Miranda* warnings and withheld Defendant's license for the duration of the interrogation and his subsequent providing of

---

[2] *Lambert* did not involve a driver with a CDL. Considering the highly regulated nature of the commercial trucking industry, the Court wonders if the applicable federal regulations require law enforcement to obtain the CDL of a driver involved in a serious vehicular collision or if there is an applicable regulation putting a driver with a CDL on notice to expect to surrender his license in a serious vehicular collision. This argument was not advanced by the Government so the Court will make further inquiry on this potential issue/argument.

a written statement, his oral and written statements shall be suppressed. The Court does not address Defendant's argument that these statements were involuntarily provided.

## III. Bates 4a: Agent Kacher's Interrogation of Defendant inside Vehicle

### a. Whether Defendant was "In Custody" During Agent Kacher's Interrogation

Defendant next requests that statements provided to FBI Special Agent Ryan Kacher be suppressed. Following the interrogation with Agent Perno, Defendant was locked in the caged, back of a patrol vehicle for over an hour. Agent Kacher and another officer then approached Defendant in the vehicle and had a conversation, asking numerous questions about the incident. He never provided Defendant with *Miranda* warnings, so the question remains whether Defendant was "in custody" during this interrogation—i.e. whether he would have felt free to terminate the encounter and leave. *Alfaro*, 2008 WL 5992268, at *22-23 (citing *United States v. Hudson*, 210 F.3d 1184, 1190 (10th Cir. 2000)).

Agent Kacher and Laguna Police Department Agent David Clendenin approached Defendant while he was in the back of a police vehicle. Agent Clendenin testified that Defendant was sitting in the back of the car with the door open and another officer standing next to him. He seized Defendant's cell phone and placed it in airplane mode. Agent Kacher asked Defendant if he had enough leg room. He then suggested that they move to a different car with more space. They moved to another vehicle where Defendant sat in the passenger seat, Agent Kacher sat in the driver's seat, and Agent Clendenin sat in the back seat. Agent Kacher began questioning Defendant. Defendant asked if he could obtain his medication from his truck, and Agent Clendenin denied him, stating he did not know what Defendant would be taking.

At this point, Defendant's license still had not been returned to him and his cell phone had been seized, both of which weigh in favor of suppression.[3] Nevertheless, what distinguishes this interrogation from that with Agent Perno is that almost immediately upon encountering the Defendant, Agent Kacher informed him that they were only sitting in the police vehicle for comfort and convenience. He informed Defendant that he was not under arrest and that he could leave at any time. Defendant then stated, "no, no, no," which he argues demonstrates that he did not understand what was being said to him. However, the Court finds that this response reflects Defendant's sentiment that he did not want to leave and was willing to cooperate and speak with officers. Agent Kacher informing Defendant that he was free to leave weighs against suppression. *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996) (providing that informing a defendant he was free to leave is one factor to consider in conducting the "totality of the circumstances" test).

Defendant asserts that a reasonable person in his situation, given his lack of understanding of English, would not have felt free to leave the encounter. Individual traits of the defendant are typically not considered in assessing the standard. The standard is objective: Would a reasonable person in the same circumstances have felt free to leave? In another District of New Mexico case, the Court discussed whether this objective standard should be refined to take into account subjective characteristics such as language barriers. In *United States v. Joe*, an FBI agent was concerned about the defendant's English proficiency, so read him his Miranda rights and asked him to repeat the rights in his own words. 770 F. Supp. 607, 608 (1991). In discussing whether the Court should consider the defendant's English knowledge in its assessment of whether he was subjected to a custodial interrogation, the Court found, "In the most egregious of situations, when a suspect's knowledge of English is *clearly inadequate*, it *may* be appropriate to refine the standard

---

[3] *United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995).

to account for this characteristic." *Id*. at 611. It found that was not the case for Defendant Joe. During the interrogation in the present case, Agent Kacher had Defendant call his son to translate a consent form to search his phone, which Defendant argues shows that Kacher was aware of his limited English. Indeed, perhaps due to his heightened emotions, Defendant's English appears to have deteriorated during his conversation with Agent Kacher compared with his conversation with Agent Perno. He did not understand words such as "advice" and provided random and unresponsive answers to a handful of questions. However, though there were moments of misunderstandings during the interrogation, Defendant was still conversant, seemed to understand most of the questions asked, provided a majority of coherent responses, and discussed a multitude of different topics. His grasp of English was not "clearly inadequate."

This interrogation is distinguishable from *United States v. Alarcon*, upon which Defendant relies. 95 F. App'x 954 (10th Cir. 2004). In that case, the Court found the defendant did not understand the *Miranda* warnings given to him in English. That defendant answered a series of "yes" or "no" questions, rather than having at-length conservations such as in the present case. The officers in that case never asked the defendant if he understood English; the same is true in the present case, but it is clear from the lengthy conversations that Defendant Riego did understand English to a reasonable degree.

Still, Defendant points to a portion of the interrogation with Agent Kacher where he had a moment of intense crying, arguing that the officers took advantage of his emotional vulnerability such that he would not have felt free to leave. However, the exhibits show that Agent Kacher calmly and patiently gave him time to collect himself before resuming the conversation. Agent Kacher stated, "Let it out, let it out, let it out. Take your time. Take your time. We're in no rush. Take a drink, take some water. Calm down, I'm in no hurry. We're gonna take it slow for awhile."

*Bates 4a*. When Defendant began speaking about the incident again, Agent Kacher cut him off stating, "We'll get to that. Right now, I just want you to be comfortable. Let's wait at least sixty seconds before I ask you any questions." *Id*. The fact that Defendant had an emotional reaction and Agent Kacher provided him with time to collect himself does not weigh in favor of suppression. Moreover, considering the horrific nature of the crash scene that involved fatalities, it is certainly understandable how Defendant, or anyone else similarly situated, would get emotional.

What ultimately weighs against Defendant's arguments is Agent Kacher's repeated statements that he was not under arrest. Initially when Defendant began speaking about the incident, Agent Kacher immediately told him he first wanted to make sure Defendant was comfortable. He cut Defendant off and told him to take a deep breath and not answer for at least 60 seconds. He told Defendant multiple times not to rush. Agent Kacher told Defendant he was not under arrest and that if "you're done talking with me, just let me know and we'll find another place for you to go. You don't have to keep talking to me." He repeated similar statements at least three times throughout the interview. When Defendant called his son, he stated that he was under arrest, but Agent Kacher again immediately assured him that he was not. Though Agent Kacher told, instead of asked, Defendant that he would drive him back to Albuquerque, he quickly assured Defendant that he was not arresting him or taking him to jail. He even "promised" Defendant that he was not under arrest when Defendant appeared not to believe him. He asked Defendant what he planned to do with his family that evening, which also signified to Defendant that he was not being taken to jail. Additionally, Agent Kacher's tone throughout the interview was very patient, calm, and understanding.

While an affirmative statement that a defendant is not under arrest and is free to leave is just one factor in determining whether a defendant reasonably would have felt free to end the encounter,[4] repeated statements to this effect are powerful evidence that a reasonable person would have understood that he was free to terminate the interview. *United States v. Jones*, 523 F.3d 1235, 1240 (10th Cir. 2008). Agent Kacher's repeated statements that Defendant was free to leave outweigh the fact Defendant's license and cell phone had still not been returned to him.

Additionally, the overall circumstances of this interrogation support the finding that a reasonable person would have felt free to leave. There were two armed officers present, however their demeanor was calm and non-accusatory. There was no physical touching, handcuffing, or other aggression. Applying the *Guillen* factors, there was not a police-dominated atmosphere, the questioning was not accusatory or coercive, and Agent Kacher informed Defendant that he was free to end the interview. *United States v. Guillen*, 995 F.3d 1095, 1109 (10th Cir. 2021)[5]. The officers were armed, but there was no physical touching or aggressive language used. Defendant sat in the passenger seat and was not handcuffed. Neither officer indicated that compliance with any request was mandatory. While the interrogation occurred inside a police vehicle, it was made clear that was due to the heat, and it occurred on the public side of the road with many people around.

These facts are distinguishable from *United States v. Richardson*, upon which Defendant relies. 949 F.2d 851 (6th Cir. 1991). In that case, the defendant was approached by four officers who

---

[4] *United States v. Gregory*, 79 F.3d 973, 979 (10th Cir. 1996).
[5] Stating that relevant factors include "(1) whether the circumstances demonstrated a police-dominated atmosphere; (2) whether the nature and length of the officers' questioning was accusatory or coercive; and (3) whether the police made [the defendant] aware that [he or she] was free to refrain from answering questions, or to otherwise end the interview." Other relevant factors include the threatening presence of several officers, brandishing of a weapon by an officer, physical touching by an officer, use of aggressive language indicating that compliance with an officer's request is mandatory, a request to accompany the officer to the station, interaction in a small or enclosed space, and absence of other members of the public. *Berkemer v. McCarty*, 468 U.S. 420, 438 (1984); *United States v. Chee*, 514 F.3d 1106, 1112-12 (10th Cir. 2008).

immediately informed him he was a suspect and asked to search his car. Upon refusing to consent to a search, that defendant was placed in the back of a police car. The court stated a reasonable person having refused to consent to a search and then being placed in the back of a police vehicle would think he was not free to leave. In the present case, on the other hand, the atmosphere was not accusatory or aggressive. Defendant was informed that they were in the police vehicle only for comfort and convenience and that he could leave at any time.

As a final note, this interrogation was sufficiently separated from the Agent Perno interrogation, such that any potential confinement Defendant would have felt would not have carried over into the Agent Kacher interview. *See United States v. Bayer*, 331 U.S. 532, 540-41 (1947) (providing that a second confession is not necessarily tainted as a fruit of the first improper confession). Agent Perno was an LPD officer, while Agent Kacher worked for the FBI. There is no evidence that the two were working together in either of these interviews. Agent Kacher immediately made clear that he was involved with the FBI and was investigating the incident separately from Agent Perno due to it occurring on tribal land. Moreover, though Defendant had been in the back of a vehicle alone for quite some time, the interrogations were separated by over an hour. Therefore, the Court determines that the statements made to Agent Kacher were not made "in custody" for purposes of *Miranda*.

    b.  *Whether the Statements Made to Agent Kacher Were Involuntary*

Defendant next argues that the statements were given involuntarily. He claims Agent Kacher coerced his confession by taking advantage of his limited knowledge of English, preying on his physical and mental state after the car accident, not informing him of his *Miranda* rights, and restricting his ability to move.

14

As discussed, factors to take into account in determining voluntariness include (1) age, intelligence, and education of the defendant; (2) length of detention; (3) length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment. *Toles*, 297 F.3d at 965-66. There were some misunderstandings during the interrogations, but overall, Defendant responded with accuracy and consistent English. His English was not so limited that questioning him was taking advantage of him. Moreover, Defendant had been sitting in the back of a police vehicle for about an hour prior to his roughly hour-long interrogation with Agent Kacher—nevertheless, this fact is not of such severity that it would have overborne Defendant's will. Similarly, he was denied access to his medications, but this does not rise to the level of creating an atmosphere that coerced Defendant's statements. Though parties dispute whether the interview lasted for 1 hour or 1 ½ hours, either amount of time was not so long that it overbore Defendant's will—especially considering that the interview took place in a car on the side of the highway in a public location. While it did occur in a police vehicle, it was made clear that they were only inside the vehicle for comfort and that Defendant was free to leave at any time. The nature of the questioning was calm, patient, and non-accusatory. Defendant was reasonably emotional considering the circumstances, but Agent Kacher allowed him to calm down before asking any questions. Defendant was not advised of his *Miranda* rights, however he was advised numerous times that he was not under arrest. He was not subjected to any physical punishment, let alone any physical touching. Overall, Defendant was not unusually susceptible to pressure, Agent Kacher did not engage in any misconduct, and the statements were freely given.

**CONCLUSION**

Defendant's First Motion to Suppress Statements and Evidence (Doc. 35) is hereby **GRANTED IN PART** and **DENIED IN PART**. Defendant's suppression motion is granted as to Bates 1659, Bates 1520, and the oral and written statements provided to Agent Perno. Defendant's suppression motion is denied as to Bates 1661 and Defendant's statements given to the various officers in the video of the scene of the collision. Finally, the suppression motion is denied as to Bates 4a and the statements given to Agent Kacher.

**IT IS SO ORDERED.**

_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE