UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                                                 Criminal No. 21-596 WJ

ALEXIS RIEGO,

    Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S SECOND MOTION TO SUPPRESS EVIDENCE

**THIS MATTER** comes before the Court upon Defendant's Second Motion to Suppress Evidence (Doc. 36), filed January 31, 2022. For the reasons stated herein, Defendant's Motion is DENIED.

## BACKGROUND

Defendant is charged with involuntary manslaughter and assault. He was working as a truck driver while driving on I-40 through the Laguna Pueblo reservation in New Mexico on September 7, 2019. He allegedly crashed into several vehicles, resulting in the deaths of four individuals and serious injuries to others. Parties dispute the cause of the crash. There is no evidence that Defendant was under the influence of drugs or alcohol, but the Government seeks to prove that Defendant was Facetiming his wife while driving.

Defendant brought the instant Motion to Suppress, requesting the Court to suppress evidence gleaned from his cell phone. Soon after the crash, Defendant was interrogated on the side of the highway by Laguna Police Department Special Agent Kevin Perno. The Court has

previously concluded that Agent Perno failed to advise Defendant of his *Miranda* rights prior to engaging in a custodial interrogation. *See* Doc. 77. About an hour or two later, Defendant was interrogated by FBI Special Agent Ryan Kacher, which the Court concluded was proper. *Id*. The instant motion deals with the facts that were in existence during the hour or so in between those two interrogations.

Following the interrogation by Agent Perno, Defendant was sitting in the caged back seat of a law enforcement vehicle with the door closed for over an hour. Laguna Police Department Agent David Clendenin and FBI Special Agent Ryan Kacher then approached Defendant while he was in this vehicle and transferred him to another vehicle. Soon after they approached him, Agent Clendenin seized Defendant's cell phone, but did not search it. Then, during the interrogation, Agent Kacher obtained a written consent form from Defendant to search the phone, but also did not search it. Law enforcement ultimately obtained a search warrant for the phone on September 12, 2019. The following Opinion addresses Defendant's various arguments that the search was improper: (1) the seizure of his telephone was unlawful; (2) Defendant did not provide valid consent to search his phone; (3) the search warrant was not supported by probable cause; (4) the search of the telephone exceeded the scope of the search warrant; and (5) the good faith exception to the exclusionary rule does not apply.[1] *See* Doc. 36.

## DISCUSSION

    I.    <u>Whether the Seizure of the Phone was Unlawful</u>

---

[1] The Court has reorganized Defendant's arguments for clarity. They were originally phrased as "(1) the seizure of his telephone was unlawful; (2) the search of the telephone exceeded the scope of the search warrant, lacked valid consent, and was thus unlawful; (3) and the good faith exception to the exclusionary rule does not apply." Doc. 36.

Defendant first argues that agents unlawfully detained Defendant by locking him in the back of a vehicle[2] and, therefore, that they unlawfully seized his phone. In other words, because Defendant was unlawfully seized by law enforcement agents, all evidence derived from this seizure (including the cell phone) must be suppressed. The Government counters that the seizure of the phone was permissible because agents had reasonable suspicion to seize it.

A seizure of property without a warrant is per se unreasonable. *United States v. Place*, 462 U.S. 696, 703 (1983). However, reasonable suspicion can justify a warrantless seizure "when the nature and extent of the detention are minimally intrusive of the individual's Fourth Amendment interests." *Id*. "[T]he principles of Terry and its progeny would permit [an] officer to [seize the personal property] briefly to investigate the circumstances that aroused his suspicion, provided that the investigative detention is properly limited in scope." *Id*. at 706. Statements made during Agent Perno's interrogation, which were taken in violation of *Miranda,* cannot be considered at a suppression hearing to establish reasonable suspicion. *See United States v. Chavez*, 985 F.3d 1234, 1246 (10th Cir. 2021) ("[W]e can think of no reason why *Vogt's* ruling would not cover suppression hearings . . . *Vogt* bars the government from relying on Mr. Chavez's un-Mirandized statement at the suppression hearing—even if the statements were voluntary." (citing *Vogt v. City of Hays*, 844 F.3d 1235 (10th Cir. 2017))). Nevertheless, even without those statements, officers had reasonable suspicion to seize the phone.

Defendant argues that there must be more than a car crash to establish reasonable suspicion to seize a cell phone. The Court agrees, however, in this instance there is much more than just the

---

[2] Contrary to Defendant's assertions, there was no evidence presented at the suppression hearing that Defendant was locked in the back of a law enforcement vehicle. There was evidence presented that Defendant sat in a law enforcement vehicle which may have had a back seat area separated from the front seat area by a caged screen. Additionally, there was testimony that at the time of the vehicular collision, the sun was out and the temperature was high so the vehicle in which Defendant sat had its engine running and air conditioning on which would explain why the doors and windows to said vehicle were shut.

occurrence of a vehicular crash. Leaving aside any questioning of Defendant Riego by the Tribal Police, when Agent Clendenin and Agent Kacher arrived at the scene, the circumstances showed (1) the crash occurred in a construction zone on Interstate 40 which was reduced to one lane of traffic with a posted slower speed limit, (2) the degree of damage and/or destruction to the vehicles, especially the crushed pick-up truck containing the four deceased individuals, indicated that the impact occurred at a high rate of speed in excess of the posted speed and in disregard of the road construction conditions, (3) there were no signs of the tractor trailer truck braking prior to impact, indicating driver inattention when the impact occurred, (4) the crushing impact was caused by the truck, and (5) the driver of the truck was Defendant Riego. The totality of these circumstances is sufficient for a law enforcement officer to conclude that there was reasonable suspicion to believe a violation of New Mexico's criminal reckless driving statute, and possibly other applicable statutes, had been committed by Defendant. Therefore, the officers were justified in seizing Defendant's cell phone.

Defendant next argues that even if there was reasonable suspicion, the seizure of the phone lasted longer than allowed by the parameters of *Terry* and its progeny to briefly detain property for only as long as reasonably necessary to briefly investigate. The record indicates that Agent Perno placed Defendant in the back of a tribal police car and began questioning him at about 1:05 p.m. Agent Perno continued interrogating Defendant for about ten minutes and then had him sign a statement. The Court's prior Memorandum Opinion and Order (Doc. 77) ruled that, based on the circumstances, Defendant was in custody during this time and because he was not advised of his *Miranda* rights, the evidence obtained during that interview was suppressed. At some later point, Defendant was moved to the back of a New Mexico State Police vehicle and also was examined by Laguna Pueblo EMS. The examination by the Laguna EMS appears to have taken

place after Agent Perno's questioning. *See* Doc. 42-1. Agent Clendenin and Agent Kacher arrived on the scene and they had Defendant move to Agent Kacher's vehicle where Defendant sat in the front seat. The Court's prior Opinion (Doc. 77) concluded that Defendant was no longer in custody at this point. At about 2:00, Agent Clendenin asked Defendant for his cell phone as "possible evidence," took custody of the phone, and placed the phone in "airplane mode" so the data could not be erased or altered.

There is nothing in the record to indicate that anyone was aware that Defendant had the cell phone with him or that anyone was taking any steps to place an investigative hold on the phone prior to Agent Clendenin. Thus, despite the fact that Defendant was in custody during Agent Perno's questioning, his cell phone had not been seized during that time. Agent Clendenin also did not appear to know that Defendant had the phone on his person because Agent Clendenin asked Defendant if he had the cell phone and only then did Defendant hand the phone over. Therefore, the cell phone was seized at or around 2:00. Agent Kacher began his questioning about 30 minutes later at 2:38 p.m. *See* Bates number 4a. About 27 minutes into Agent Kacher's questioning, Kacher obtained Riego's voluntary consent to search the phone (*See Infra* Section II). *Id*. That consent was a bit over an hour after seizure of the cell phone. Therefore, the investigative seizure of the phone based on reasonable suspicion lasted for roughly an hour.

The reasonableness of an investigative seizure of property is based on all the surrounding facts and circumstances. There is no "bright line" for how long is too long to seize property. The facts of the instant case are distinguishable from *U.S. v. Place* where the Supreme Court held that seizing a single piece of luggage from a passenger in line at an airport and holding the piece of luggage for 90 minutes to get a drug sniffing dog was unreasonable. 462 U.S. 696 (1983). Instead, the officers in this case were faced with a massive multi-vehicle crash involving four fatalities,

injured and distraught individuals all in a construction zone along a major interstate highway in a rural part of New Mexico and a long distance from any major city. It took some time for first responding law enforcement officers to even arrive at the crash scene. Once the New Mexico State Police accident reconstruction team arrived, they indicated that it was going to take them at least two to three hours to investigate and document the scene. Doc. 42-1. The Field Deputy Medical Investigator did not even arrive on the scene until 3:30 PM, approximately 4 hours after the crash happened. As such, the length of time officers held onto the phone for investigative purposes was not unreasonable given the magnitude and complexity of what the first responding officers had encountered at the crash scene. Because officers had reasonable suspicion to seize the phone, the Court does not address the argument that there was probable cause and an exigency to seize the phone.

II. Whether Defendant Consented to a Search

Even if there was no reasonable suspicion to seize the phone, the inevitable discovery doctrine cuts against Defendant's case. The doctrine permits evidence to be admitted if an independent, lawful police investigation inevitably would have discovered it. *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 1986). The Tenth Circuit does not require a completely independent investigation, but it requires that the lawful means of discovery be independent of the constitutional violation. *United States v. Christy*, 739 F.3d 534, 541 (10th Cir. 2014). Under this theory, the discovery of the phone must have been independent of Agent Perno's interview and any subsequent improper seizure of Defendant or his phone (which the Court has concluded did not occur). However, it need not be independent of Agent Kacher's interview, which was proper. *See* Doc. 77.

Defendant argues that had he not been improperly detained in the police vehicle for over an hour, he would have gone home and would have never had the opportunity to speak with Agent Kacher. However, the vehicular crash at issue occurred on Interstate 40 within the exterior boundaries of the Laguna Indian Reservation. Defendant's truck was inoperable, and walking to the nearest village would have required walking into the desert or along the side of the interstate highway on a hot day for miles. His brother-in-law had arrived on the scene to pick him up, and while evidence was not presented as to specifically when he arrived, it appears from Defendant's arguments that the brother-in-law arrived after the Agent Kacher interrogation began. And during that interview, even without any prior indication from Agent Perno, Agent Kacher would have learned of the relevance of Defendant's cell phone. Before they started talking about the crash, Agent Kacher asked Defendant where his final destination was that day. Defendant stated North Carolina and then added, unprompted, that he was talking to his wife on the phone via Bluetooth and that his phone was on the dashboard. He stated that he wanted to check the phone and logbook to compare it to the crash. This would have caused Agent Kacher to independently question Defendant about his phone use leading up to the crash, which would have provided probable cause to seize the phone. Therefore, the discovery of the relevance of the phone was independent of any alleged constitutional deprivation. The question is then whether Defendant gave voluntary consent to search the phone.

Consent is given voluntarily when the Government proffers "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given" and "the officers must have used no implied or express duress or coercion." *United States v. Sanchez*, 608 F.3d 685, 690 (10th Cir. 2010). The Government argues that Agent Kacher obtained Defendant's permission to search the phone during the interrogation. During the interview, Agent Kacher asked Defendant

if his phone was password protected. Defendant responded that it wasn't and stated, "You want to open it? Anytime." *See* Bates number 4a. Later, Agent Kacher had Defendant call his son to translate a consent form. The son asked his father in Spanish if he would give consent to search the phone. However, it appears the son did not know the Spanish translation of the word "consent," as he used the English word. In light of this mixed translation, Defendant then appears to not have understood what the son was asking, as he responded, "Tell him I was talking to your mom on the phone." The son then told Agent Kacher that Defendant gave his consent to search the phone, which did not occur in that interaction.

Nevertheless, the fact remains that Defendant unequivocally provided his consent to open the phone when, earlier in the interrogation, he told Agent Kacher he could open his phone anytime. Defendant counters that this consent was given involuntarily—i.e., that he was merely acquiescing to an improper show of authority after his rights had been violated. For the same reasons as discussed in the Court's prior Memorandum Opinion and Orders (*See* Docs. 77, 78), the statements given to Agent Kacher—including Defendant's consent to open his phone—were voluntary. This finding is supported by the three factors accorded special weight when determining whether a consent to search was given freely and voluntarily: 1) the temporal proximity of the seizure and the consent, 2) the presence of intervening circumstances, and 3) the purpose and flagrancy of the official misconduct. *United States v. Sandoval*, 29 F.3d 537, 543 (10th Cir. 1994). As to the first and second factors, the phone was seized immediately after Defendant had been detained in the back of the police vehicle and about an hour after the improper Agent Perno interview. However, he provided his consent to search the phone 27 minutes into the interrogation with Agent Kacher—and after Agent Kacher told him numerous times that he was free to end the interrogation and leave. While Agent Perno should have informed Defendant of his *Miranda* rights

and returned his license to him, and while Defendant should not have been placed in the back of a closed police vehicle, that behavior was not purposeful or flagrant.

Moreover, a typical, reasonable person would have understood the interaction between Agent Kacher and Defendant as him providing his consent. *United States v. Kimoana*, 383 F.3d 1215, 1223 (10th Cir. 2004). There were no "threats, promises, inducements, deception, trickery or an aggressive tone." *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006). Other factors to be considered are the physical and mental condition and capacity of the defendant, the number of officers on the scene, the display of weapons, and whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent. *Id*. Defendant was understandably emotional given the circumstances, but not so emotional that he could not give voluntary statements. There were two officers present when Defendant provided his consent, and both were armed in that their service handguns were holstered, but neither displayed any aggressive or authoritative tone. The overall atmosphere of the interrogation was patient and calm, and Agent Kacher told Defendant numerous time he could end the interrogation and leave. No *Miranda* warnings were provided, but none were required, and as such, the consent was obtained through lawful means of authority.

Therefore, because Defendant provided valid consent, the relevance of the phone would have been inevitably discovered.

III. <u>Whether the Warrant was Valid</u>

Even if Defendant did not provide consent, the phone would have been inevitably searched due to the issuance of a search warrant. Defendant argues that the warrant to search the phone was not supported by probable cause. Defendant argues that it was supported by unlawfully obtained evidence, which cannot provide a basis for probable cause. Indeed, statements made to Agent

Perno were obtained in violation of *Miranda* and should not have been included in the warrant. *United States v. Hatfield*, 333 F.3d 1189, 1194 (10th Cir. 2003) (providing that if information is obtained unlawfully and is critical to establishing probable cause for a warrant, the evidence seized during the search is inadmissible); *United States v. Sims*, 428 F.3d 945, 954 (10th Cir. 2005) (stating that if the affidavit contains sufficient untainted evidence, the warrant is valid). However, the Agent Kacher interrogation would have provided more than enough information to obtain a warrant—the warrant includes the statements made to Agent Kacher that Defendant was driving 65 or 70 mph, and he took his eyes off the road for approximately one minute to check his logbook which he kept on his phone mounted on the dashboard. *See* Doc. 36, Ex. 1. He said when he looked up, there was a car in front of him. He hit the brakes, but it was too late. *Id*. Even without any of the other facts in the warrant, these statements—particularly that Defendant was looking at his phone for an entire minute—"would warrant a man of reasonable caution to believe that evidence of a crime would be found at the place to be searched." *United States v. Harris*, 369 F.3d 1157, 1165 (10th Cir. 2004). Therefore, the warrant is supported by valid probable cause, so the issue becomes whether the search exceeded the scope of the warrant.

    IV.    <u>Whether the Search Exceeded the Scope of the Warrant</u>

The search warrant authorized a search of the cell phone for:

i. Pictures and videos of activity related to commercial trucking activities since 9/1/2019.

ii. Books, records, receipts, notes ledgers, records and documents related to commercial trucking activity since 9/1/2019.

iii. Any and all call logs, text logs and content and activity from messaging/communication applications on 9/7/2019.

      iv.    Device usage logs including basic diagnostic information and device usage on 9/7/2019.

It also allowed a search for "Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted; such as, logs, phonebooks, saved usernames and passwords, documents, and browsing history." It authorized "the forensic examination of the device for the purpose of identifying the electronically stored information" described above.

When law enforcement exceeds the scope of the warrant, a defendant's rights under the Fourth Amendment are violated. *Bowling v. Rector*, 584 F.3d 1078, 1094 (10th Cir. 2009); *United States v. Bonner*, 808 F.2d 864, 868 (1st Cir. 1986). Notably, the warrant did not authorize a full download of all data in Defendant's phone, which is what law enforcement conducted. The warrant specifically identified the dates of the data that was authorized to be searched. The Government argues that a comprehensive, full download of all of the data was proper based on the warrant's permittance of (1) "Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted; such as, logs, phonebooks, saved usernames and passwords, documents, and browsing history"; and (2) "the forensic examination of the device for the purpose of identifying the electronically stored information." However, both of those provisions refer to the parameters outlined in the warrant, which specifically limit the search to data that was created, edited or deleted in September of 2019 or after. If these provisions were intended to allow a comprehensive search of all the data, then the more specific provisions would be rendered meaningless.

The Government next argues that a comprehensive search was necessary in order to determine which files fell within the parameters of the warrant. It first cites to *United States v.*

*Burgess*, which stated that a search of electronic media "may be as extensive as reasonably required to locate the items described in the warrant based on probable cause." 576 F.3d 1078, 1092 (10th Cir. 2009). However, that case dealt with a warrant that authorized a search for evidence of a specific crime (drug trafficking activities), not a search for evidence from a specific date. The Court determined that a comprehensive download was permissible because there was no way to know before opening each file whether it contained an image of drug trafficking activities. It noted the difficulties in restricting the search mechanisms with that type of warrant:

> The warrant here did not direct the search by describing file name extensions (.doc, .wpd, .txt, .jpg, .gif, etc.), file names or directory structure. Rather the limitation on the scope of this search was explicitly constrained by content -- computer files containing evidence of drug use or trafficking. Such files could take many forms. Pay-owe sheets could be generic text files (.txt) or word processing documents, e.g. Microsoft Word (.doc, .docx, .dot, .dotx, etc.), Corel WordPerfect (.wpt, .wpk, .wpd, .wp7, etc.), or other word processing programs and, of course, there is the ubiquitous .pdf from Adobe. Address books or the electronic version of a rolodex might be found in Outlook (.pst) or other Email program files or they could be in spreadsheets such as Excel (.xls, .xlsb, .xltx, etc.), Lotus 1-2-3 (.wks, .wk4, etc.), Quattro Pro (.qpw) Quicken (.qsd, .qdf, .qel, etc.), or OpenOffice (.ods, .ots, etc.). Or they could be database files like Access (.accdb, .mdb,.maf, .mar, etc.) or Paradox (.db). *Id*. at 1093.

It continued,

> It is unrealistic to expect a warrant to prospectively restrict the scope of a search by directory, filename or extension or to attempt to structure search methods -- that process must remain dynamic. While file or directory names may sometimes alert one to the contents (e.g., "Russian Lolitas," "meth stuff," or "reagents"), illegal activity may not be advertised even in the privacy of one's personal computer -- it could well be coded or otherwise disguised. The directory structure might give hints as to an effective search strategy, but could just as well be misleading and most often could not effectively, or even reasonably, be described or limited in a warrant. Keyword searches may be useful in locating suspect files, but not always. In this case, for instance, some of the pictures of R.C. contained lurid text (see n.5 & 7), which, if searchable, might lead an investigator to those images by use of keyword searches. But that text does not appear in the filename, meaning it would not be revealed by a filename search. And if the text was an embedded graphic (rather than embedded text) it might not be revealed even in a word search of the entire document. Moreover some of the pictures of R.C. (Exhibits 830-834) had the following path: 07 301 8\8Hold\RC2007\May\252627\Towel\ and indescript

filenames, such as Img_5777_875.jpg. The path and filename of one particularly graphic image (Exhibit 816 -- lurid text superimposed) was: 07 301 8\8\Als_u621x2a.jpg. On the other hand the path and/or filename may sometimes give an obscure hint as to the content. For instance three of the pornographic child pictures from the Maxtor and Seagate hard drives (Exhibits 805, 807 and 808) had this path: 07 301 8\8\Files\SG\Kp\Amateur Access\DCP\ (emphasis added). But the file names, such as DCO01352.jpg, gave no hint as to file content. *Id*.

While it is impossible to know before opening a file whether it contains evidence of drug trafficking activities, the same cannot be said for whether the file was created on or before a specific date. The warrant in this case authorized a search of data that was created after 9/1/2019 and 9/7/2019. Files reflect their date of creation, so it is not necessary to open a photograph, for instance, to see if it was taken before 9/1/2019.

The Government also relies on *United States v. Williams*, 592 F.3d 511, 522 (4th Cir. 2010). Similar to *Burgess*, the warrant in that case authorized a search for evidence of crimes of making threats and computer harassment. The Court stated,

> To conduct that search, the warrant impliedly authorized officers to open each file on the computer and view its contents, at least cursorily, to determine whether the file fell within the scope of the warrant's authorization-i.e., whether it related to the designated Virginia crimes of making threats or computer harassment. To be effective, such a search could not be limited to reviewing only the files' designation or labeling, because the designation or labeling of files on a computer can easily be manipulated to hide their substance. Surely, the owner of a computer, who is engaged in criminal conduct on that computer, will not label his files to indicate their criminality. *Id*.

Again, a warrant restricted to searching for evidence created on a specific date does not raise the same search mechanism issues as a warrant restricted to searching for evidence of a specific crime.

Nevertheless, what saves the Government's position is that the issue is not whether the officers conducted a comprehensive download, but whether they actually searched data that fell outside the parameters of the warrant. Moreover, it does not appear from the Government's

briefing or arguments that it intends to introduce any records or data that were created, edited or deleted prior to September 2019. Thus, this argument is moot, and the search of the phone remains proper based on reasonable suspicion to seize the phone and Defendant's consent to search it.

For the foregoing reasons, Defendant's Second Motion to Suppress Evidence (Doc. 36), is hereby **DENIED**.

IT IS SO ORDERED.

_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE