# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

_____

UNITED STATES OF AMERICA,

      Plaintiff,

    v.                              No. 1:21-cr-00596-WJ-1

ALEXIS RIEGO,

      Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR A NEW TRIAL

**THIS MATTER** is before the Court on Defendant's Opposed Motion for a New Trial (Doc. 230, "Defendant's Motion"), filed October 6, 2022. Nine days earlier, a federal jury convicted Defendant of four counts of involuntary manslaughter and two counts of assault resulting in serious bodily injury resulting from Defendant crashing his tractor trailer truck into stopped traffic on Interstate 40 ("I-40") within the exterior boundaries of the Laguna Pueblo Indian Reservation. Doc. 225. Defendant now moves for a new trial under Fed. R. Crim. P. 33, arguing that errors in the proceeding deprived him of his Due Process Clause right to a fair and impartial trial. Defendant asserts five grounds in his motion: (1) prosecutorial misconduct; (2) jury instruction error; (3) perceived judicial bias; (4) the Court's failure to provide curative instructions; and (5) cumulative error. The Court finds that none of Defendant's arguments are supported by the law or the record.  Therefore, Defendant's Motion is **DENIED**.

## BACKGROUND

### I.     Procedural Posture

On July 26, 2022, Defendant Alexis Riego was indicted by a grand jury on four counts of involuntary manslaughter in violation of 18 U.S.C. § 1112 and two counts of assault resulting in

serious bodily injury in violation of 18 U.S.C. § 113(a)(6). Doc. 125. The United States alleged that Defendant, while driving on Interstate 40 through the Laguna Pueblo, crashed his commercial tractor trailer into a row of stopped traffic while speeding, using a handheld mobile device, driving recklessly, and driving while not physically qualified. The impact killed four occupants in the first vehicle, a Chevrolet Silverado, and seriously injured two occupants in the second vehicle, a Hummer H2. In order to illustrate the death and destruction resulting from this horrific crash, the Court attaches as exhibits to this opinion the following photographic exhibits that were introduced at trial:

A. Gov. Ex. 6:  Photograph of the entire crash scene.

B. Gov. Ex. 7: Photograph of the front of the tractor trailer truck driven by Defendant.

C. Gov. Ex. 11: Photograph of the Chevrolet Silverado pick-up truck containing the four deceased victims.

D. Gov. Ex. 16: Photograph of the Hummer H2 in which two of the occupants suffered serious bodily injury.

The occupants of the Chevrolet Silverado and the Hummer H2 were all members of the Waquie family.  The deceased occupants in the front seats of the Chevrolet Silverado were identified in the Second Superseding Indictment (Doc. 126) as John Doe 1 and Jane Doe 1 and were husband and wife. Jane Doe 2 and Jane Doe 3 were the 6 and 3 year old granddaughters of John Doe 1 and Jane Doe 2 and were strapped in their car seats in the back seats of the Chevrolet Silverado. All occupants of the Hummer H2 survived the crash.  John Doe 2 was the driver of the Hummer H2 and was identified as a victim of assault resulting in serious bodily injury and his daughter, Jane Doe 4 was a passenger in the Hummer H2 and was also identified as a victim of assault resulting in serious bodily injury.  John Doe 2 is the son of John Doe 1 and Jane Doe 1 and

the father of Jane Doe 2, Jane Doe 3 and Jane Doe 4.  The wife of John Doe 2 and the mother of

Jane Doe 2, Jane Doe 3 and Jane Doe 4 was also a passenger in the Hummer H2 but the indictment

did not identify her as a victim of assault resulting in serious bodily injury.

The case proceeded to trial. On September 27, 2022, a jury convicted Defendant of all six

counts charged in the indictment. Doc. 225.

To convict Defendant of involuntary manslaughter under 18 U.S.C. § 1112, the United

States had to prove beyond a reasonable doubt that Defendant committed: "the unlawful killing of

a human being without malice, . . . [i]n the commission of an unlawful act not amounting to a

felony, or in the commission in an unlawful manner, or without due caution and circumspection,

of a lawful act which might produce death." The Court submitted special interrogatories to the jury

to determine which, if any, of the four unlawful acts charged by the United States supported the

jury's involuntary manslaughter verdict. The jury unanimously found that Defendant committed

the unlawful acts of speeding, reckless driving, and operating a motor vehicle without due caution

and circumspection. Doc. 225. Defendant's involuntary manslaughter convictions were thus

supported by three independent predicate offenses, only one of which is necessary to support the

verdict.

## II.     Testimony of Expert Witness Stan Lundy

Defendant's Motion devotes significant attention to the allegedly improper testimony of

United States' expert crash reconstructionist, Stan Lundy. At trial, Defendant disputed the

reliability of Lundy's crash reconstruction model, particularly the methods he used to calculate

Defendant's speed.

The Court held a hearing pursuant to *Daubert v. Merrell Dow Pharm., Inc.* on May 24,

2022, in which Lundy testified as to his credentials, experience, and the specific process he used

to reconstruct Defendant's crash. 509 U.S. 579 (1993). At the *Daubert* hearing, Lundy testified that he used three different methods to calculate that Defendant's commercial motor vehicle ("CMV") was travelling at or above 70 miles per hour at the time of impact. The crash occurred at a location on I-40 where the east bound two lanes were being merged into a single lane because of road construction. With the approaching construction zone, the speed limit was reduced to 55 miles per hour and neither party disputed the 55 miles per hour speed limit at the location of the crash.

First, Lundy used what he described as "[t]he most consistent" method, pulling the speed data recorded on the CMV's electronic control module ("ECM"). Doc. 178 at 39. As Lundy explained, all modern vehicles contain an ECM that "basically runs the engine, and it does this by sensor inputs from various parts of the [vehicle] and the engine." *Id.* at 21-22. The ECM records data such as speed, engine revolutions per minute ("RPM"), sudden deceleration, and the last time a vehicle stopped. *Id.* at 22. The ECM's "speed signal comes from the speed sensor mounted in the drivetrain on the driveshaft." *Id.* at 64. Lundy testified that the ECM on Defendant's CMV showed Defendant was travelling 71 miles per hour at the time he rear-ended the Chevrolet Silverado. *Id.* at 39.

Second, Lundy used the "speed in gear" calculation to estimate that Defendant was travelling 70 miles per hour at the time of impact. Lundy explained that the calculation involves inputting several figures into a formula, including engine RPM, transmission gear ratios, and tire size. *Id.* at 40. Lundy used the ECM to find the engine RPM, which is relayed to the ECM from a sensor on the driveshaft that senses revolutions. *Id.* at 64. He used the physical markings on the tires to confirm tire size. Lastly, Lundy used the model number stamped on the transmission to find the corresponding gear ratio in the manufacturer's product manual. During cross-examination

at the *Daubert* hearing, Lundy admitted he inadvertently used the wrong transmission ratio in his initial calculation. After correcting the gear ratio from .73 to .769, Lundy corrected his initial 76.6 mile per hour estimate of Defendant's speed in gear to 69.66 miles per hour. *Id*. at 58.

Third, Lundy used the "Delta V" method to calculate Defendant's closing speed of 71 miles per hour at impact. "Delta V is a sudden change in velocity." *Id.* at 66. According to Lundy, he can calculate the closing speed of a vehicle by formula if he has the weights of both vehicles involved in a collision as well as their changes in velocity. Lundy testified that he weighed the Silverado and Defendant's CMV. He then used the weights of each vehicle and the Delta V of the Silverado as inputs in a mathematical formula to calculate Defendant's closing speed. Lundy stated that he "got a Delta V from the Chevrolet pickup event data recorder ("EDR")," which is contained within the Silverado's ECM. *Id.* at 66. Lundy also testified that the Silverado's EDR showed that it was travelling "zero" miles per hour at the time of impact. *Id.* at 69. Lundy stated that this was corroborated by the "hot shock" of the filaments in the Silverado's brake lights, which proved that the Silverado had its brake pedal depressed at the time of impact. *Id*. at 28. Although Lundy testified that he used the Silverado's EDR to determine that the vehicle was stationary, he never testified that EDR data was necessary nor that it was the exclusive evidence he relied upon to make that determination.

At trial, Lundy again testified that he used three methods to determine the speed of Defendant's CMV at impact. First, he "looked at the engine control module data," which "said 71 miles [per] hour." Doc. 232 at 40. Second, Lundy testified that he recalculated the speed in gear to be 70 miles per hour with the corrected transmission specs. *Id.* at 41-42. Third, he stated that he used the Delta V method which showed Defendant's closing speed was 70 miles per hour. When the United States asked how Lundy determined the Chevrolet Silverado's Delta V to calculate

Defendant's closing speed, Lundy responded that he used the information in the Silverado's EDR. *Id.* at 43. On re-direct examination, Lundy clarified that he was also able to calculate Defendant's closing speed without EDR data because he had independent evidence that the Silverado was not in motion at the time of impact. *Id.* at 71-72. Lundy's testimony on re-direct aligns with his earlier testimony on direct, in which he stated that "weight becomes important" in the "traditional methods of reconstruction," which involve using "weights and some calculations" to reconstruct a crash without EDR data. *Id.* at 26-27. Of Lundy's three speed calculations, the Delta V method is the only one that Lundy testified requires inputting the vehicles' weights.

Finally, Lundy testified that his three independent methods of calculating Defendant's speed were all within approximately one mile per hour of each other. Lundy described the range as "[v]ery tight" and added that he "would be tickled to death" if he "could do a reconstruction and come up with that range every day." *Id.* at 70. All three calculations suggest that Defendant was travelling at least fifteen miles per hour over the speed limit at the time of impact.

### III.    Testimony of Ryan Kacher

Defendant's Motion also addresses the United States' examination of Federal Bureau of Investigations ("FBI") Special Agent ("SA") Ryan Kacher. SA Kacher conducted a one-and-a-half-hour interview of Defendant in his patrol vehicle following the crash. The United States called SA Kacher as a witness and played portions of the interview audio recording to the jury. The recording contains Defendant's admissions that he looked down at his phone while driving for more than a minute and was driving between 65 and 70 miles per hour at the time of the crash. Doc. 177 at 66. In the first thirty-six minutes of the recording, SA Kacher interviews Defendant about his actions before, during, and after the crash. The remainder of the audio consists of downtime and small talk between SA Kacher and Defendant as they drove from the crash site to

Albuquerque. At the end of the recording, SA Kacher asks Defendant for consent to conduct a blood draw and a search of Defendant's cell phone. Because the crash occurred on a Saturday, there was no FBI translator available. *Id.* at 70-71. SA Kacher therefore asked Defendant's son to translate the consent forms for the blood draw and search. *Id.* at 22.

During pretrial litigation, Defendant filed a motion in limine to exclude the introduction of Defendant's son's statements made during the translation. Doc. 111. Defendant asked the Court to "prohibit the introduction of [all] statements that would violate the hearsay rule," including Defendant's son's translation. Notably, Defendant only moved the Court to exclude the statements themselves, not any reference to the fact that SA Kacher had assistance from a translator. *See* Doc. 111. The Court held an evidentiary hearing where the United States stated that it did not object to the relief Defendant requested in his motion in limine. Doc. 184 at 5.

## LEGAL STANDARD FOR MOTION FOR NEW TRIAL

"A motion for a new trial is generally not regarded with favor, and is granted only with great caution." *United States v. Perea*, 458 F.2d 535, 536 (10th Cir. 1972). Rule 33 of the Federal Rules of Criminal Procedure authorizes motions for a new trial: "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial *if the interest of justice so requires*." Fed. R. Crim. P. 33 (*emphasis* added). A defendant may bring a Rule 33 motion based upon trial error, including false testimony, failure to disclose exculpatory evidence, and misconduct affecting the jury. 3 Charles Alan Wright et al., Federal Practice and Procedure § 581 (4th ed.). "New trial motions are subject to the harmless and plain error provisions of Rule 52; if the substantial rights of the defendant were not affected, the court should refuse to grant the defendant's motion." *Id.* Because a "motion for new trial is based on the presumption that the verdict against the defendant is valid, the burden is on the defendant" to demonstrate that a new trial should be granted. *United*

*States v. Velarde*, 860 F' App'x. 132, 137 (10th Cir. 2021) (internal quotation omitted).

## DISCUSSION

Defendant asserts five categories of error in support of his Rule 33 Motion: (1) prosecutorial misconduct; (2) jury instruction error; (3) perceived judicial bias; (4) the Court's failure to provide curative instructions; and (5) cumulative error. Upon review, the Court does not find any errors, much less errors that prejudiced Defendant's right to a fair and impartial trial. The Court will address each purported error in turn.

### I.   Prosecutorial Misconduct

Defendant alleges the United States committed prosecutorial misconduct at trial in three ways: (1) improperly questioning witnesses Stan Lundy and Ryan Kacher; (2) referring to Defendant's recorded interview as "testimony"; and (3) arguing facts not in evidence during closing argument. The United States responds that "Defendant cannot establish prosecutorial misconduct in this case, much less any that would require granting a new trial." Doc. 237 at 3. The Court agrees.

Prosecutorial misconduct is the overstepping of "the bounds of that propriety and fairness which should characterize the conduct of [the United States Attorney] in the prosecution of a criminal offense . . . ." *Berger v. United States*, 295 U.S. 78, 84 (1935). "We use a two-step process when evaluating claims of prosecutorial misconduct. First, we examine whether the conduct was, in fact, improper. If we answer that question in the affirmative, we must then determine whether it warrants reversal." *United States v. Oberle*, 136 F.3d 1414, 1421 (10th Cir. 1998). "When evaluating allegedly inappropriate remarks of counsel for plain error, we must view the remarks in the context of the entire trial." *Id.* (citation omitted). "Absent prejudice, a prosecutor's improper statements alone will not require a new trial." *United States v. Christy*, 916 F.3d 814, 826 (10th

Cir. 2019). Thus, "[t]he relevant question is whether the [prosecutor's] comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darned v. Wainwright*, 477 U.S. 168 (1986) (internal quotation omitted). Defendant's allegations fall well short of meeting this standard.

### A. Improper Witness Testimony

Defendant alleges that the United States committed prosecutorial misconduct by improperly questioning two of its witnesses, SA Ryan Kacher and crash reconstructionist Stan Lundy. To determine whether a prosecutor committed misconduct by asking a question that elicits a potentially improper answer, the Court asks: "(1) whether the prosecutor acted in bad faith, (2) whether the district court limited the effect of the improper statement through its instructions to the jury, and (3) whether the improper remark was inconsequential in light of the other evidence of defendant's guilt." *United States v. Meridyth*, 364 F.3d 1181, 1883 (10th Cir. 2004) (citation omitted).[1] Defendant's prosecutorial misconduct claims patently fail under this standard.

### 1. Testimony of SA Kacher

Defendant asserts that the United States elicited testimony from SA Kacher that the United States stipulated it would not introduce, thereby committing prosecutorial misconduct. In making this argument, Defendant appears to misunderstand his own motion in limine. During pretrial litigation, Defendant moved to exclude "all hearsay statements," including Defendant's son's translation of two FBI consent search forms. Doc. 111. In response, the United States redacted the translation from the audio recording of SA Kacher's interview of Defendant and agreed not to

---

[1] Defense counsel misstates the applicable law. Defendant submits that the Tenth Circuit employs a two-factor test that asks (1) whether the improper remark was solicited by the government, and (2) whether the government's line of questioning was reasonable. Doc. 230 at 11. The Tenth Circuit explicitly states within the footnote Defendant cites that those factors are helpful inquires "subsumed within the 'bad faith' factor" of its three-part test. *Meridyth*, 364 F.3d at 1183 n3.

otherwise introduce the contents of the translation. Neither Defendant's motion in limine nor the United States' stipulation required that the United States refrain from identifying that a translation occurred—they merely required that the United States not introduce the statements themselves.

At trial, Defendant raised his unfamiliarity with English to undermine the reliability of the admissions he made to SA Kacher. Midway through the trial, the United States called SA Kacher as a witness and played portions of the interview audio recording to the jury. The United States also introduced both consent search forms. After introducing the forms, the United Sates asked SA Kacher, "[a]s you were going over the consent forms with [Defendant], did you obtain any additional assistance to do that?" Doc. 236 at 16. SA Kacher responded, "I did." Defendant immediately objected before SA Kacher could elaborate. *Id*. The Court held a bench conference in which Defendant argued the United States was "trying to go back" on its stipulation not to introduce the translation. *Id.* at 17. The United States responded: "I think we can still introduce the fact that there was a translation that happened. I'm not introducing the statements that were made." *Id.* The Court expressed that it needed to review Defendant's motion in limine to make a ruling. Further review proved to be unnecessary because the United States abandoned the line of questioning and made no reference to the translation.

The Court is at a complete loss to understand how the United States' single, unanswered question inquiring into SA Kacher's "assistance" in reviewing consent forms constitutes prosecutorial conduct, nevertheless misconduct that impaired Defendant's right to a fair and impartial trial. The United States did not violate its stipulation. A plain reading of Defendant's motion in limine reveals that he moved to exclude "hearsay statements." *See* Doc. 111. SA Kacher's testimony that he used an interpreter would have been direct, first-hand testimony, not hearsay. *See* Fed. R. Evid. 801 (hearsay is an out-of-court statement offered to prove the truth of

the matter asserted). Moreover, the United States never used the word "translation" in its examination and SA Kacher never clarified what kind of "assistance" he obtained. Even if a thoughtful juror had inferred that the United States was attempting to elicit that SA Kacher had assistance from a translator, that testimony was entirely admissible. Accordingly, there was no improper questioning by the United States.

Even if the question had violated the United States' stipulation, it could not have prejudiced Defendant's right to a fair and impartial trial. Defendant did not attempt to contest that he voluntarily consented to the blood draw and phone search. And in the Court's view, the evidence could have only bolstered Defendant's language barrier argument—it showed SA Kacher had some knowledge of Defendant's difficulty understanding English, but only sought a translator after Defendant's admissions. Further, the jury's conviction did not rest on any evidence obtained from the blood draw or phone search. The United States did not argue that Defendant was intoxicated, and the jury unanimously found that Defendant was not using a hand-held mobile telephone while driving. Doc. 225 at 3. The consent forms are unrelated to Defendant's speed and reckless driving, which each independently support the jury's verdict. The issue was thus inconsequential in light of all the other evidence of Defendant's guilt. *Meridyth*, 364 F.3d at 1883.

In sum, the Court finds that the United States questioning of SA Kacher was not improper and it did not prejudice Defendant.

### 2. Testimony of Stan Lundy

Defendant asserts that the United States elicited perjured testimony from crash reconstructionist Stan Lundy, or alternatively, failed to disclose exculpatory information. The United States argues that "Defendant cannot establish either of these false-dichotomy claims." Doc. 237 at 5. The Court agrees.

### a. The United States did not knowingly present perjured testimony

The Court first addresses Defendant's perjury claim and concludes that Stan Lundy did not commit perjury, the United States did not knowingly elicit perjury, and the issue was inconsequential in light of other evidence of Defendant's guilt.

Defendant's perjury claim relates to the purported inconsistency between Stan Lundy's testimony at the *Daubert* hearing that he used ECM data in his Delta V calculation, and his testimony at trial that he also conducted a Delta V calculation without ECM data. Lundy testified at the *Daubert* hearing that he used the Silverado's ECM data to conclude that the Silverado was stationary and thereby calculate its Delta V. Doc. 178 at 69. At trial, Defendant argued that ECM data is unreliable when used for crash reconstruction and therefore Lundy's speed calculations are unreliable. Defendant presented evidence that ECMs contain a warning label that "tells you not to rely on it for accident reconstruction," and elicited testimony that "the ECM does not retrieve sudden deceleration event information with requisite specificity." Doc. 232 at 63-64. On cross-examination Lundy conceded the point but added "[t]hat's why I used one more method." *Id.* at 63. He further stated that he "used some of that [ECM] data" and "did some more calculations" that were consistent with the ECM data. *Id.* On re-direct, the United States asked Lundy about the calculations that corroborated the ECM data: "[s]o based upon the weight of the Silverado and the weight of the [CMV], knowing that the Silverado was not in motion, were you able to calculate the speed without using any of the data from the ECM or EDRs?" *Id.* at 72-73. Lundy responded that he did. *Id.* at 73.

Defendant argues that the alleged discrepancy between Lundy's pretrial and trial testimony constitutes perjury, and that the United States knowingly elicited Lundy's perjured testimony. For Defendant to prevail on his claim, he must show: "(1) that the testimony was false, (2) that it was

material, and (3) that it was knowingly and intentionally used by the government to obtain a conviction." *United States v. Wolny*, 133 F.3d 758, 762 (10th Cir. 1998) (citations omitted).

Defendant has failed to demonstrate that Lundy's testimony at trial was false, and thus cannot demonstrate that he committed perjury. Pejury occurs when a witness, under oath, "willfully and contrary to such oath states or subscribes any material which he does not believe to be true." 18 U.S.C. § 1621. "Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony." *Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir. 1991).

Defendant has not shown that Lundy's pretrial and trial testimony are inconsistent, much less that his trial testimony was false. The United States disclosed two separate estimates of the Silverado's Delta V in Lundy's expert report, indicating that Lundy calculated Defendant's closing speed by two different methods. Doc. 237 at 9. The first Delta V estimate matched the Silverado's ECM data and the second Delta V was not reflected in the ECM data at all. *Id.* Lundy used each Delta V as an input in separate calculations to reach two estimates of Defendant's closing speed. It appears to the Court that Lundy testified about the first estimate at the *Daubert* hearing when he stated that he relied on ECM data. However, Lundy never stated or implied that the Silverado's ECM data was the only way to calculate Defendant's closing speed. At trial, Lundy testified that nonelectronic evidence such as tire marks and gouges on the roadway and the "hot shock" of the Silverado's taillights indicated that the Silverado "was sitting there stopped." Doc. 232 at 44. This allowed Lundy to calculate the Silverado's Delta V and an estimate of Defendant's closing speed, "based upon the weights of the Silverado and the weight of the [CMV] . . . without using any of the data from the ECM or EDRs." Doc. 232 at 72-73. Defendant has presented no evidence that Lundy did not manually calculate Defendant's Delta V closing speed using the second method,

nor that the government had such knowledge.[2] Accordingly, Defendant "has not shown that the trial testimony was false, and as such, knowingly used by the prosecution." *Wolny*, 133 F.3d at 763.

Finally, the Court concludes that the alleged improper questioning of Stan Lundy was not prejudicial because there was an abundance of other evidence that Defendant was speeding. The uncontroverted evidence at trial established that the speed limit at the crash location was 55 miles per hour. Lundy testified that he made three independent calculations of Defendant's speed that ranged from 70 to 71 miles per hour. Defendant's alleged impeachment of Lundy only concerns the third calculation. The jury also heard an audio recording in which Defendant himself admitted he was travelling 65-70 miles per hour at the time of impact. Doc. 236 at 37. The jury saw lapel camera video and still photos of the crash scene that depicted a nearly unrecognizable crushed Chevrolet Silverado, an upside-down and heavily damaged Hummer H2 and a heavily damaged commercial motor vehicle.  *See* Exhibits A, B, C and D attached hereto. Defendant did not present any factual evidence or even attempt to argue that he was driving at or below the speed limit. The jury had ample evidence to conclude that Defendant was speeding at the time of impact even without Lundy's Delta V calculation. A Defendant is not entitled to a new trial when there is "the slightest possibility of harm." *United States v. Pinelli*, 890 F.2d 1461, 1473 (10th Cir. 1989). Defendant's dispute over the manner in which Lundy calculated his third estimate of Defendant's speed is inconsequential in light of the overwhelming evidence that he was travelling above the

---

[2] In his reply brief, Defendant presented an affidavit from a purported expert crash reconstructionist stating that "Mr. Lundy's calculations do not detail a calculation for Delta V wherein he does not use data from the vehicle's modules." The Court refuses to consider new expert evidence offered for the first time in Defendant's reply brief because it deprives the United States of an opportunity to respond. *See Bennett v. Sprint Nextel Corp.*, No. 09-2122-EFM, 2013 WL 1197124, at *2 (D. Kan. Mar. 25, 2013) ("Courts in this circuit generally refuse to consider new evidence offered for the first time in a reply brief").  Defendant had the opportunity to retain his own crash reconstructionist prior to trial and present that expert's testimony at trial to challenge Lundy's calculations, but apparently chose not to do so.

speed limit.

**b. The United States did not commit a discovery violation**

Defendant next asserts that, if Stan Lundy did not perjure himself—and therefore did perform a manual Delta V calculation—then the United States failed to turn over Lundy's calculation. The United States contends that it "provided all of Lundy's discovery to Defendant," and that Defendant's "misunderstanding of the evidence does not indicate there was a discovery violation. Upon review, the Court finds that Defendant failed to assert a factual basis for his claim.

The United States' discovery obligations "are defined by Rule 16, *Brady*, *Giglio*, and the Jencks-Act." *United States v. Griebel*, 312 F. App'x 93, 96 (10th Cir. 2008).[3] Rule 16(a) of the Federal Rules of Criminal Procedure sets forth the United States' mandatory disclosures. Specifically, Rule 16(a)(1)(F) requires the government to disclose the results or reports of any scientific test or experiment in its possession. Fed. R. Crim. P. 16(a)(1)(F). "The language is clear on its face. It requires the prosecution to turn over 'results or reports' of scientific tests." *United States v. Price*, 75 F.3d 1440, 1445 (10th Cir. 1996) (citations omitted) (holding that government complied with Rule 16 without turning over "the underlying bases of the government chemist's conclusion . . . ."). The United States disclosed Stan Lundy's expert report. The report included two different Delta V values for the Silverado, one of which "was not reflected in the data recordings." Doc. 237 at 9. In other words, the United States disclosed the "results" of Lundy's manual Delta V calculation, which satisfied its discovery obligation under Rule 16(a)(1)(F). Lundy's expert report provided Defendant with notice that Lundy used two different Silverado

---

[3] Defendant frames the government's alleged nondisclosure of Lundy's calculation as a failure to disclose exculpatory evidence in violation of *United States v. Brady*, 373 U.S. 83 (1963). The Court is unmoved by Defendant's argument that the calculation is exculpatory because "Lundy would have been impeached thereon." Doc. 230 at 15. Further, Defendant failed to demonstrate that the United States suppressed the Delta V calculation because it provided the results of Lundy's calculations as required by Fed. R. Crim. P. 16.

Delta V values to calculate Defendant's closing speed. Defendant was not deprived of an opportunity to cross-examine Lundy on either of his closing speed calculations.

Defendant has failed to establish his claims that the United States knowingly elicited perjury from Stan Lundy and that the United States committed a discovery violation. Accordingly, Defendant is not entitled to a new trial a new trial on these grounds.

### B.  Improper closing argument comment

Defendant next attempts to paint the United States' misstatement during rebuttal closing argument, which was cured by the Court, as an intentional comment on Defendant's failure to testify that warrants a new trial. Defendant did not testify at trial. Defendant did, however, state in a recorded interview with SA Kacher that he was travelling between 65 and 70 miles per hour at the time of the crash. Doc. 236 at 67. During closing argument, the Assistant United States Attorney ("AUSA") making the rebuttal closing argument referred to Defendant's recorded statement as testimony: "the Defendant also testified that he was travelling 65 to 70 miles an hour . . . ." Doc. 233 at 58. Defendant objected and the Court immediately held a brief bench conference. Afterward, the Court issued a curative instruction: "The objection is sustained. Members of the jury, disregard the last statement made by counsel. And then, counsel, rephrase." *Id*. at 59. The AUSA rephrased and stated that "[t]he Defendant in his statement to the FBI indicated that he was driving 65 to 70 miles an hour, which just confirms what Lundy already told you." *Id*.

"The general rule of law is that once a defendant invokes his right to remain silent, it is impermissible for the prosecution to refer to any Fifth Amendment rights which defendant exercised." *United States v. Burson*, 952 F.2d 1196, 1201 (10th Cir. 1991). To determine if a prosecutor's comment was improper, a reviewing court must "determine whether the jury at trial would have understood the prosecutor's reference to the [Defendant's] statement as a comment on

[Defendant's] silence." *United States v. Nelson*, 450 F.3d 1201, 1213 (10th Cir. 2006). A comment is improper if "the language used by the prosecutor was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify." *Id.* (internal quotation omitted). "Manifest intent will not be found if some other explanation for the prosecutor's remark is equally plausible." *United States v. Mora*, 845 F.2d 233, 235 (10th Cir. 1988) (internal quotation omitted). A stray improper remark or minor aberration made in passing during closing argument is no basis for upsetting a trial. *Whittenburg v. Werner Enterprises, Inc.*, 561 F.3d 1122, 1131 (10th Cir. 2009).

The Court finds that the AUSA's statement was not intentional but an honest mistake made in the heat of an aggressively litigated criminal jury trial. Defendant has not shown that the United States "manifestly intended" to comment on Defendant's failure to testify. *Nelson*, 450 F.3d at 1213. Plainly, the AUSA misspoke and inadvertently referred to Defendant's recorded statement as testimony. The United States apologized at the bench conference and offered to rephrase. Doc. 233 at 58. This is not a case where the United States attempted "to draw the inference that [Defendant] must be guilty because he failed to speak or invoked a constitutional right." *Nelson*, 450 F.3d at 1213. The United States did mischaracterize Defendant's recorded statement as testimony, but the Court immediately instructed the jury to disregard the United States' statement to cure any potential error. *See United States v. Morgan*, 748 F.3d 1024, 1042 (10th Cir. 2014) ("juries are presumed to follow curative instructions."). Moreover, the Court provided a jury instruction stating that "Defendant Alexis Riego did not testify, and . . . you that you cannot consider his decision not to testify as evidence of guilt." Doc. 221 at 27. In complex criminal jury trials, sometimes judges make misstatements, sometimes prosecutors make misstatements and sometimes even criminal defense lawyers make misstatements.  Accordingly, the Court finds that

the United States' did not "manifestly intend" to comment on Defendant's failure to testify and thus, there was no prejudice to Defendant.

### C. Arguing facts not in evidence

Defendant's final prosecutorial misconduct claim is that the United States argued facts not admitted into evidence during closing argument. Defendant's argument misconstrues the United States' attempt to argue a reasonable inference to the jury as improper misstatement of the evidence.

At trial, the United States introduced a log of Defendant incoming and outgoing cell phone calls that displayed the time and duration of the calls as well as the phone number of the other party. The United States drew the jury's attention to several FaceTime calls between Defendant and his wife that the United States alleged took place during and immediately after the crash. Neither party introduced evidence of the content of the calls. During closing argument, the United States attempted to argue the inference that Defendant's wife called him back repeatedly because she knew that he was involved in a crash: "[w]hy did she call him in quick succession after that FaceTime call had ended? Because she knew something had happened. She was on that cell phone, on that FaceTime call with the Defendant at the time the crash happened." Doc. 233 at 56. Defendant objected. The Court held a bench conference, asked the United States to make clear that it was asking the jury to draw an inference, and instructed the jury to disregard the United States' statements. *Id.* at 56-57. The United States rephrased and moved on.

The Court finds that any potential impropriety in the United States' argument was cured by the Court's instruction. "The prosecutor is allowed a reasonable amount of latitude in drawing inferences from the evidence during closing summation." *United States v. Manriquez Arbizo*, 833 F.2d 244, 247 (10th Cir. 1987) (citation omitted). "[A] prosecutor's summation may appropriately

suggest to the jury what inferences it ought to draw from the evidence in the case." *United States v. Pena*, 930 F.2d 1486, 1490 (10th Cir. 1991) (citations omitted). The United States introduced Defendant's call history and iPhone Health App pedometer data that showed Defendant was walking immediately after the FaceTime call that the United States alleged occurred during the crash. The United States' evidence thus supported the theory that Defendant was on a FaceTime call with his wife at the time of the crash and that she called him multiple times shortly after the crash. Based on that evidence, the United States argued the reasonable inference that Defendant's wife called to check on him because she knew he had been in a crash. The United States' inference was not "calculated to mislead the jury," inject an extraneous issue, or "inflame the jury's passions." *Id.* at 1490-91. Out of an abundance of caution, the Court instructed the jury to disregard the United States' statements and the United States clarified that it was asking the jury to draw an inference rather than asserting facts admitted into evidence.

The Court also finds that the comment was inconsequential in the larger context of the trial. The United States' argument concerned the predicate offense, using a hand-held mobile telephone while driving, of which the jury did not convict Defendant. Doc. 225 at 3. The disputed portion of the United States' closing argument has no bearing on Defendant's speeding, which itself is a sufficient predicate offense to support his involuntary manslaughter convictions. The Court thus concludes that the jury did not "render a conviction on grounds beyond the admissible evidence presented," and a new trial is not warranted. *United States v. Espinosa*, 771 F.2d 1382, 1401 (10th Cir. 1985).

## II.   Jury Instruction Error

Defendant next argues that the Court failed to submit required jury instructions and legal definitions such that he was deprived of his right to a fair trial. Specifically, Defendant points to

the Court's: (1) failure to include an instruction defining "knowingly"; (2) failure to define "wanton" and "circumspection"; and (3) failure to instruct the jury that "speed alone cannot support a finding beyond a reasonable doubt" that Defendant committed reckless driving. Doc. 230 at 24-25. The Court's jury instructions followed the Tenth Circuit Pattern Instructions, properly stated the law, and did not prejudice Defendant.

When evaluating a claim of jury instruction error, the reviewing court must consider the instructions as a whole. *United States v. Pack*, 773 F.2d 261, 267 (10th Cir. 1985). "[A] trial judge is given substantial latitude and discretion in tailoring and formulating the instructions so long as they are correct statements of law and fairly and adequately cover the issues presented." *Id.* (citation omitted). The trial court is not required to follow the exact language of Defendant's proposed instructions. *United States v. Nolan*, 551 F.2d 266, 275 (10th Cir. 1977). The Tenth Circuit reviews "the district court's decision about whether to give a particular instruction for abuse of discretion." *Martinez v. Caterpillar, Inc.*, 572 F.3d 1129, 1132 (10th Cir. 2009) (citation omitted). "As long as the charge as a whole adequately states the law, the refusal to give a particular instruction is not an abuse of discretion." *McKenzie v. Benton*, 388 F.3d 1342, 1348 (10th Cir. 2004) (internal quotation omitted). The Tenth Circuit reverses only if it has "substantial doubt" as to whether the jury "was fairly guided in its deliberations." *Lutz v. Weld County Sch. Dist. No. 6*, 784 F.2d 340, 341 (10th Cir. 1986) (citations omitted).

First, Defendant argues that the Court's decision not to include Tenth Circuit Pattern Instruction 1.37, the definition of "knowingly," constitutes reversible error. To convict Defendant of involuntary manslaughter, the United States had to prove that Defendant "knew" that his conduct was a threat to the lives of others or it was foreseeable to him that his conduct was a threat to the lives of others. *See* Tenth Circuit Pattern Jury Instructions Criminal No. 2.54.1; *see also*

Doc. 221 at 8. The Court did not find it necessary to submit an additional instruction to the jury to define such a commonplace word. "[I]n this case the definition of 'knowingly' was obvious. There was no need to define it. The word is a common word which an average juror can understand and which the average juror could have applied to the facts of this case without difficulty." *United States v. Chambers*, 918 F.2d 1455, 1460 (9th Cir. 1990) (holding trial court did no err in by not submitting an instruction defining "knowingly"). The Ninth Circuit's reasoning holds in this case—the jury did not ask for a definition of "knowingly" nor request clarification of the involuntary manslaughter instruction.[4]

Second, Defendant argues that the Court's instruction to apply the common definition of "wanton" and "circumspection" requires reversal. Defendant's own authority forecloses his claim. To achieve an involuntary manslaughter conviction, the United States was required to prove that Defendant acted with "gross negligence amounting to wanton and reckless disregard for human life." Doc. 221 at 8. Moreover, to prove one of its five alternative involuntary manslaughter legal theories, the United States had to show that Defendant operated "a motor vehicle in an unlawful manner without due caution and circumspection, which act might produce death." *Id.* at 8. During deliberations, the jury asked the Court to define "circumspection" and "wanton." Doc. 224 at 5. The Court instructed the jury to [a]pply the common definition of these two words." *Id.* In *United States v. Bryant*, The Tenth Circuit upheld a trial court's "decision to have the jury apply the common understanding of the "wanton and reckless" [involuntary manslaughter] element" in response to the jury's request for a definition. 892 F.2d 1466, 1468 (10th Cir. 1989). The *Bryant*

---

[4] The Court also notes that the Tenth Circuit's comment to Pattern Instruction 1.37 states that giving this instruction is discouraged and it should only be given "when the Government presents evidence that the Defendant purposely contrived to avoid learning all the facts in order to have a defense in the event of prosecution." (citing *United States v. Delreal-Ordones*, 213 F.3d 1263, 1268 (10th Cir. 2000). No such evidence was presented by the Government in this case.

court reasoned that the "terms are commonplace." *Id.* The Court finds that the Tenth Circuit's reasoning equally applies to the term "circumspection." Defendant's efforts to distinguish *Bryant* are unconvincing.

Third, Defendant contends that the Court erred by electing not to charge the jury with Defendant's specific language that "speed alone cannot support a finding beyond a reasonable doubt of reckless driving." Doc. 230 at 25. A defendant is not "entitled to any specific wording of instructions." *Bryant*, 892 F.2d at 1468. The Court instructed the jury on the elements of reckless driving in Instruction No. 14. The instruction outlines three separate elements that the United States had to prove to establish reckless driving. Doc. 221 at 21. The second element requires that the United States prove "Defendant drove carelessly and heedlessly in willful or wanton disregard of the rights or safety of others *and* without due caution and circumspection *and* at a speed or in a manner so as to endanger or be likely to endanger any person or property." *Id.* (*emphasis* added). The plain language of the Court's instruction thus makes clear that speeding alone is insufficient to prove reckless driving.[5] A separate instruction was unnecessary.

In conclusion, the Court does not find any error of law in its reckless driving instruction or that the Court abused its discretion by declining to instruct the jury on Defendant's requested definitions. A new trial is not warranted on these grounds.

## III.    Perceived Judicial Bias

---

[5] The Court is precluded from considering Defendant's affidavit regarding the juror's interpretation of this instruction. *See* Fed. R. Evid. 606(b)(1) (stating the court may not receive evidence of a juror's statement on "mental processes concerning the verdict."). The Affidavit, prepared by Defendant's private investigator after post-trial questioning of the jurors, also contradicts the instruction given to the jurors that "[y]our deliberations will be secret. You will never have to explain your verdict to anyone." See Instruction No. 32, Doc. 221 at 39 (10th Circuit Pattern Instruction 1.23).

Defendant argues that the Court exhibited judicial bias or the appearance of judicial bias during trial in four ways: (1) by using animated hand gestures and expressing impatience, irritation, or agitation with the defense during several bench conferences; (2) by overruling Defendant's objections to Augustine Waquie Jr. providing emotionally charged testimony in narratives; (3) by refusing to inquire into whether Stan Lundy perjured himself during his testimony; and (4) interfering with Defendant's closing argument by not allowing a comparison of the original and "blurred" video and instructing the jury to disregard part of Defendant's closing argument. Doc. 230 at 22; Doc. 243 at 12-14. Defendant contends that the appearance of judicial bias violated Defendant's due process rights. Doc. 230 at 21.

There is a strong presumption in the law that, in performing their official duties, judges act with honesty and integrity and are capable of overcoming biasing influences and rendering evenhanded justice. *Del Vecchio v. Illinois Dept. of Corrections,* 31 F.3d 1363 (7th Cir. 1994). When claiming a violation of due process, a defendant may overcome this presumption by establishing either actual bias or the appearance of bias on the part of the Judge. *Fero v. Kerby,* 39 F.3d 1462, 1478 (10th Cir. 1994).

The party alleging a due process violation based on judicial bias has the burden of presenting compelling evidence of sufficient strength to overcome the presumption of judicial fairness. *Fero,* 39 F.3d at 1478-79. Further, to demonstrate judicial bias or the appearance of bias, the alleged bias must stem from an extrajudicial source outside the judicial proceeding at hand and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case. *Liteky v. United States,* 510 U.S. 540, 545 & n. 1, 555 (quoting *United States v. Grinnell Corp.,* 384 U.S. 563, 583 (1966)).

Under the extrajudicial source factor, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky,* 510 U.S. at 555. Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the case, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Judicial remarks during the course of the proceedings, even if they are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. Such remarks may do so only if they reveal an opinion that derives from an extrajudicial source. *Id.* at 555-56. Further, expressions of impatience, dissatisfaction, annoyance, and even anger, do not establish bias or partiality and are within the bounds of what federal judges may sometimes display. A judge's ordinary statements or actions in the administration of courtroom proceedings are immune and do not establish impropriety or impartiality. *Id.*

A reasonable factual basis must exist for calling the judge's impartiality into question. *United States v. Cooley,* 1 F.3d 985, 992-93 (10th Cir.1993); *Nichols v. Alley,* 71 F.3d 347, 350-51 (10th Cir. 1995). Thus, "[r]umor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters" are not support for a finding of judicial bias. *Cooley*, 1 F.3d at 993; *United States v. Greenspan,* 26 F.3d 1001, 1005-1006 (10th Cir. 1994). Bias cannot be predicated upon the merest unsubstantiated suggestion of personal prejudice. *Cooley,* 1 F.3d at 993 (quoting *Franks v. Nimmo,* 796 F.2d 1230, 1235 (10th Cir.1986). Defendant's claim of judicial bias or the appearance of bias in violation of his due process rights fails for several reasons.

First, Defendant does not allege, and the record is devoid of, any facts or evidence of opinions of the Judge stemming from any extra-judicial source. All of the actions Defendant claims present the appearance of bias clearly and directly arise from and in the course of the court

proceedings. *Liteky,* 510 U.S. at 545 & n. 1, 555.  Second, hand gestures, annoyance, or impatience by the Judge, if any, occurred during bench conferences and could neither be seen nor heard by the jury and do not constitute the basis for a claim of judicial bias. *Liteky,* 510 U.S. at 555. Third, although the Court did allow the prosecution some leeway in eliciting narrative testimony by Augustine Waquie, Jr., the Court admonished counsel to limit narrative answers. As to the emotional nature of the testimony, Augustine Waquie, Jr. is identified as John Doe 2 in the Second Superceding Indictment and was the driver of the Hummer H2 depicted in Exhibit D attached hereto.  The record developed in this case shows that after Mr. Waquie extracted himself and his other family members from the upside-down Hummer H2, he discovered the crumpled mass of steel that was formerly the Chevrolet Silverado pick-up truck containing the deceased bodies of his Mother and Father and his 6 and 3 year old daughters.  Since Mr. Waquie was testifying based on his actual observations and knowledge about the facts and circumstances relating to this crash including the deaths of four family members, his own physical injuries and the physical injuries to his other daughter, emotion was unavoidable.  However, the emotion displayed by Mr. Waquie in testifying about what happened to him and to the members of his family did not rise to the level of being unfairly prejudicial under Fed. R. Evid. 403 and is certainly not evidence of judicial bias. *Id.* at 555-56*.* The United States had the burden of proof in this criminal case and so there was nothing inappropriate about the United States calling Mr. Waquie as a victim and a fact witness to testify in the United States' case-in-chief.

Fourth, regarding expert witness Stan Lundy and as previously discussed above, the Court concludes Mr. Lundy did not commit perjury. However, even if he had, the Court allowed Defendant to raise the issue and to impeach Mr. Lundy and so there is no appearance of judicial bias arising out of Lundy's testimony. Last, as to the blurred video, the Court expressed concerns

about defense counsel implying that the prosecution had manipulated or altered exhibits because there was no evidence in the record to that effect. However, the Court advised counsel that Defendant could argue comparison of the original and the "blurred" videotape in closing argument. Although counsel told the jury they could "draw their own conclusions," counsel chose not to pursue the argument further. Doc. 233 at 45, line 11-48, line 8. The Court did instruct the jury to disregard the statement by counsel that the prosecution had altered the videotape, but the Court also directed the jury to disregard statements by the prosecution made in the prosecution's closing and rebuttal closing arguments, and those instructions did not demonstrate any appearance of judicial bias. *See, e.g.,* Doc. 233 at 56, line 1-57, line 2; at 58, line 5-59, line 7.

Defendant has presented no allegation or factual evidence of judicial bias from some extra-judicial source. *Liteky,* 510 U.S. at 545 & n. 1, 555. Nor do the claimed instances of conduct and rulings during the proceedings, or their cumulative effect, give rise to any inference of or appearance of bias on the part of the Judge. *United States v. Cooley,* 1 F.3d at 992-93. Defendant has not presented any evidence, much less compelling evidence, sufficient to show judicial bias in violation of the Due Process Clause, and so the Court denies Defendant's request for a new trial based on alleged bias. *Fero,* 39 F.3d at 1478-79.

## IV.    Failure to Provide Curative Instructions

Defendant also argues that the Court's failure to provide curative instructions prejudiced his right to a fair trial. Defendant alleges that the Court should have given curative instructions after three events: (1) after the United States referred to Defendant's wife's phone calls in closing argument; (2) after the United State referred to Defendant's recorded interview as "testimony"; and (3) after Stan Lundy allegedly committed perjury. The Court provided curative instructions in the first two instances and found no improper conduct to cure in the third instance.

Defendant's contentions have no merit because the Court adequately cured any potential prejudice to Defendant through its curative instructions. As outlined above, Stan Lundy did not commit perjury and no curative instruction was warranted. Moreover, Defendant was afforded extensive cross-examination of Mr. Lundy. Defendant's two remaining alleged errors occurred during closing argument. During closing argument, "a stray improper remark . . . is no basis for upsetting a trial." *Whittenburg,* 561 F.3d at 1131. Moreover, curative instructions "can go far in erasing prejudice occasioned by an improper remark." *Id.* (citation omitted). "[T]he more improper the argument and the more prejudicial the circumstances, the more specific and timely must be the curative instruction." *Id.* at 1132. As discussed above, the United States' comments during closing argument were not improper and had no prejudicial effect. Counsel for the United States misused the word "testified" and neglected to explicitly state that she was arguing a reasonable inference. In each instance, the Court immediately instructed the jury to disregard the United States' statements. Defendant has failed to show that the Court's curative instructions were inadequate, and so the Court denies Defendant's Motion on this ground.

## V.     Cumulative Error

Lastly, Defendant asserts that the cumulative effect of all errors alleged in his Motion warrant a new trial. The Court disagrees. "A cumulative-error analysis merely aggregates all the errors that individually have been found harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Rivera*, 900 F.2d 1462, 1470 (10th Cir. 1990). The cumulative-error analysis "should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors." *Id.* at 1471 (citations omitted). Reversal is only warranted if Defendant's substantial rights were affected. *Id.* at 1470. As discussed in this opinion,

Case 1:21-cr-00596-WJ   Document 244   Filed 12/09/22   Page 28 of 30

Defendant has failed to demonstrate that there were any errors in the conduct of his trial. As such, there was no error to accumulate and thus, Defendant's claim fails.

## CONCLUSION

For the reasons stated in this opinion, the Court finds that Defendant has failed to establish all five claims raised in support of his Motion for a New Trial under  Fed. R. Crim. P. 33, and the Court concludes that the interests of justice do not require a new trial. Defendant's Motion for a New Trial is therefore **DENIED**.


**IT IS SO ORDERED.**


_____
WILLIAM P. JOHNSON
CHIEF UNITED STATES DISTRICT JUDGE

**Exhibit A**



**Exhibit B**



**Exhibit C**



**Exhibit D**

